PASSUMPSIC BANK *v.* MOSES M. STRONG AND FREDERICK ELLSWORTH.

[IN CHANCERY.]

*Assignment. Statute, (Laws of* 1852, *No.* 18.)

An assignment of a portion of a debtor's property, for the benefit of a part only of his creditors, is not an assignment "for the benefit of creditors" within the meaning and operation of the "act relating to assignments," passed in 1852; it being *held*, by a majority of the court, that that act embraces other than *general* assignments; hence such special assignment was *held* inoperative as against a subsequent attachment and levy, and that the death of the debtor did not affect the right of the attaching creditor to enforce the judgment, obtained against the debtor before his death, by execution and levy.

The view expressed in the opinion in *Stanley* v. *Robbins*, 36 Vt., 422, that said law of 1852 is applicable only to *general* assignments, not adopted by a majority of the court.

BILL IN CHANCERY. The orators brought a suit against George W. Strong in 1854, and recovered judgment therein in 1858, and caused execution to be levied on certain real estate in Rutland, which had been attached when said suit was instituted. Previous to this suit and attachment, said George W. had conveyed by deed of trust said real estate to the defendant, Moses M. Strong, and said Moses M. subsequently sold and conveyed the same to the defendant Ellsworth. This bill, dated April 11, 1860, was brought to have said deeds declared void, and the defendants decreed to convey said premises to the orators. The defendants answered, evidence was taken, and the cause was submitted on the pleadings and evidence, at the June Term, 1862, Caledonia county, POLAND, Chancellor, when it was *pro forma* ordered that decree be entered in favor of the orators according to the prayer of their bill, and for their costs, from which the defendants appealed. The facts are sufficiently stated in the opinion of the court.

*E. J. Phelps*, for the defendants.

*Jonathan Ross*, and *Edwin Edgerton*, for the orators.

Argued and determined at the general term, 1865.

The opinion of the court was delivered by

BARRETT, J. The orator Bank brought a suit against George W. Strong of Rutland, and, on the 21st day of July, 1854, attached all his real estate in said Rutland. Judgment was recovered by the plaintiff in said suit, at the March term, 1858, of Rutland County Court, for $2450.75 damages, and $31.65 costs. Said property was the subject of prior attachments, so that, on the 22d of February, 1859, and within five months after said prior attachments had been discharged, the orator levied, by execution on said property, to a sufficient amount to satisfy said judgment. Those prior attachments had been made on the 11th of said July, and upon the same writs all the real estate of said Strong in Mendon and in Sherburne was also attached, on debts to a large amount. On the 12th of said July said Strong executed a deed of said

property lying in Rutland to the defendant, Moses M. Strong, in trust, for the purpose of paying certain specified creditors, giving a preference to some over the others of said creditors, and also to secure the said Moses for all his liabilities for the said George. The creditors thus provided for constituted only a part of all to whom he was indebted. The property thus assigned was worth some $15,000. Said George, at the same time, was possessed of a large amount of real estate in said Mendon and in said Sherburne; also an interest, one sixth, in a marble quarry, in Rutland, valued at several thousand dollars; and also stock and bonds in several foreign companies to the amount of several thousand dollars. At the time he executed said deed, so far as his own personal debts were concerned, he was entirely solvent and in good credit. But he was, at the same time, liable as endorser on paper for the Rutland and Washington Railroad Company, which subsequently failed, to an amount considerably exceeding all his property. In view of such liability, and for the purpose of making provision for the payment of his private and confidential debts, in preference to those on which he was liable for said Railroad Company, (of which the orator's was one,) he made said conveyance to said Moses M. Said George W. died on the 28th day of October, 1858. Said Moses M., under the provisions of said deed, conveyed said property in Rutland to said Ellsworth, on the 19th of July, 1858, in pursuance of a sale thereof to him. The trust deed of George W. to Moses M. Strong was acknowledged and recorded in the usual way of ordinary deeds of real estate in Vermont. Nothing was done in respect to it under the assignment law passed in 1852. The main question labored in the argument, and the only one to be discussed in this opinion, is whether that conveyance of July 12, 1854, was an assignment "for the benefit of creditors," within the meaning and operation of the " act relating to assignments." Session Acts of 1852, No. 18. It is claimed that, as this was not a *general* assignment, in the sense in which that term has been used, expounded and settled in this state, it does not fall within the purview and operation of that act. This must depend, of course, on what is held upon the question, whether that act was designed to embrace any other than *general* assign-

ments, in the sense above indicated.   For clearly this was not a general assignment in that sense.  *Mussey et al.* v. *Noyes et al.,* 26 Vt., 462.   In the first place, it is to be noticed that the language of the act does not make or import any distinction of different kinds of assignments.   On the contrary, it is most comprehensive. " All assignments hereafter made of property, including choses in action, by debtors for the benefit of creditors," shall, etc.   In the next place, the provisions in detail of the act, as to the course to be pursued, may as well be applied and carried into effect in case of a *special* or a *partial* assignment as in case of a *general* one. There is no more practical difficulty in the one case than in the other.   In the next place, we think the history of the law of assignments, judicial, legislative and practical, tends strongly in favor of the idea that the act of 1852 was not designed to be limited to *general* assignments.   What was meant, in the law and in business, by *general* assignments had come to be fully appreciated, after the act of 1843 had been going on in practical use and in judicial administration for several years.   It had been appreciated with less point and impressiveness prior to the enacting of that law, for there had been less occasion to regard and stand upon the distinction between *general* and *partial* or *special* assignments. Prior to that act of 1843, debtors had become largely accustomed to transfer the title to their property to a party in trust, for the professed benefit of some or all of their creditors.   Generally the conveyances covered all that was subject to attachment or to be reached by trustee process.   This done, experience showed that whoever else might be benefited by the transaction, creditors were not.  · Trustees almost never paid anything to them.   If the property was sought to be reached by attachment, in defiance of the assignment, the result was generally profitless, often ruinous, litigation.   Assignors, in the main, lived on as if nothing had happened, except that some of them thereby seemed to become independent gentlemen of leisure.   The assignee was but the assignor *in masque.*   The debts were unpaid.   The property had disappeared, and nobody called to account.   See remarks of Isham, J., 26 Vt., p. 692 ; Hinman, J., 21 Conn., 610, in *Beers* v. *Lyon.*   This course and state of things had come to be recog-

nized and felt as intolerable throughout the state. At the session of the legislature, in 1843, several elaborate projects of an assignment law were brought out. While all agreed that something must be done, no single project of an elaborate law could secure sufficient favor to enable it to be enacted. At last, a simple bill, declaring all general assignments void, was proposed and passed. Then it was that the distinction between *general* assignments and those that were *not* general became of controlling importance ; and then it was that the professional brain was taxed to get up modes and kinds of assignment that the judicial brain should say were *not general.* The result was a series of transactions, in various parts of the state, of which some conspicuous instances have become the subject matter of cases in our Reports, as *Mussey et al.* v. *Noyes et al.*, 26 Vt., 462 ; *Peck & Co.* v. *Merrill and trustees,* Ib., 686 ; *Noyes & Co.* v. *Hickok, trustee of Dow*, 27 Vt., 36. After nine years of that kind of experience, under the act of 1843, within which time professional and judicial wit had demonstrated that said act was wholly inadequate to the purpose designed by it, for the reason that, by resort to assignments that fell the merest trifle short of being *general,* all the substantial iniquities could be successfully practised after the law of 1843 was enacted, that it was the purpose and design by that law to prevent; the legislature, in 1852, took the matter in hand, and enacted the law, No. 18, of that session, "In relation to Assignments." It was drafted by Judge Bennett. It hardly seems supposable, in view of the part that assignments just short of being *general* had played, and of the consequences resulting therefrom, after the law of 1843 came in force, that the legislature would have aimed the law of 1852 exclusively at *general* assignments, inasmuch as they had been proved to be of very slight necessity as a means of enabling debtors to keep their property from a lawful and just appropriation to the payment of their honest debts, in case *special* assignments, as devised by the bar, and cherished by the courts, were permitted to brood with immunity over all but a fragment of the debtor's property. But the truth is, the law of 1852 was designed to serve the substantial purpose which the law of 1843 was intended, but had failed, to serve, and at the same time to

prevent that purpose from being effectually thwarted by an evasive resort to those *special* assignments which had kept just outside of the letter of the law of 1843, but had been successfully used, with all the attendant evils that that law was designed to put an end to. Hence the opening language of the first section of the law of 1852 : " All assignments hereafter made of property, including choses in action, by debtors for the benefit of creditors, shall be in writing," etc. The purpose named, " for the benefit of creditors," constitutes the only limitation upon this requirement. *All* assignments for that purpose shall be made and proceeded with in detail according to the provisions of the law, or they shall be deemed inoperative against the creditors of the assignor. Thus it was the legislature, affected by the experience of the law as it had theretofore existed and been administered, made the effort, in 1852, to diminish, if not entirely to do away with, the evils springing from the assignment of property by debtors for the professed benefit of creditors. By means of that law they were compelled to do it openly, and the whole transaction was exposed to inspection by all interested parties, and might be made the subject of summary accountability in the court of chancery. Again, the practical reasons for requiring partial or special assignments to be made in the manner provided by the law of 1852, are as strong as for requiring general assignments to be so made. The interests of creditors are often as much involved in and affected by a partial or special assignment as by a general one. The case of Low's assignment in *Mussey* v. *Noyes et al.*, and of Merrill's assignment in *Peck & Co.* v. *Merrill and trustees*, and of Dow's assignment in *Noyes & Co.* v. *Hickok, trustee*, *supra*, constitute pertinent and ample illustrations. Moreover, it is plain, from the nature of the subject, that a debtor may so dispose of a part of his property, for the benefit of some of his creditors whom he designs to favor by preference, as to render it of the utmost importance to the other creditors to know, at once and authentically, just what property has been thus appropriated, in what manner appropriated, and for whose benefit, so that they may be enabled to know just how they are situated with reference to the debtor and his property, and may advisedly determine upon the most proper course to be pur-

sued by themselves, in regard to their own debts. If the law of 1852 is to be held not applicable to such assignments, then, since that law, all assignments but *general* have been subject to the "darkness and long despair" that reigned over all assignments prior to the law of 1843, and over all but *general* assignments after that law was enacted.

It is to be borne in mind that this case stands upon the law of 1852. The law of 1855 does not come into consideration in deciding it. The decision of the case of *Farr* v. *Brackett*, 30 Vt., 344, and the opinion drawn up by Judge Bennett, are in consonance with the views above intimated, so far as the law of 1852 is concerned. His closing remark as to the law of 1855 was a volunteer *obiter*, and obviously was made without special consideration of the subject, and nice weighing of the language of that remark. We have no occasion for discussing that act, or that remark, now, and therefore pass them by, suggesting that the cases are not infrequent in which the reason is as strong why all the creditors of a debtor should be entitled to share alike, *pro rata*, under a *special* as under a general assignment. If we were to volunteer an opinion on this subject, it would be that the legislature meant, by the law of 1855, in connection with the law of 1852, to put it out of the power of a debtor to give preference among his creditors, by putting any part of his attachable property into the hands of a trustee for administration in payment of his debts.

The only case in which, in the published opinion, views have been expressed adverse to those above presented, as to the law of 1852, is *Stanley* v. *Robbins*, 36 Vt., 422. In that case Judge Peck expresses the opinion that that law is applicable only to general assignments. We agree with him that it was meant to substitute and supplant the law of 1843. But it by no means follows that it was meant to embrace no wider field of subject and application than the law of 1843. The difference in the language used is strong evidence, as affecting the interpretation, that the act of 1852 was designed to have a wider scope than that of 1843. "All *general* assignments," says the act of 1843. "All assignments," says the act of 1852. Inasmuch as the expression *general* assign-

ments does not embrace *all* assignments, and as *special* assignments are just as familiar to the law and to business as *general*, and are as well embraced under the term *all* assignments, the result seems inevitable, from the omission of the word *general* in the act of 1852, that the expression " all assignments," in that act, was designed to embrace *special* as well as general.

It is proper to remark, then, that the instrument in question in the case of *Stanley* v. *Robbins* was not an assignment in any sense, nor of any kind, but was a lease for three years, reserving rent, with a stipulation on the part of the lessee that he would pay a certain part of the rent to a person who held a note against the lessor, that creditor having no privity with either party in respect to such stipulation, and so the court held. This being so it did not become material to the decision of that case to discuss, construe or decide whether the law of 1852 is applicable to general assignments exclusively, or not. The majority of the court, in the case now in hand, are unable to adopt the view expressed by PECK, J., in that case, and think that, as applicable to this case, that view is untenable. We regard the assignment of George W. Strong to Moses M. Strong as being within the language and purpose of the statute of 1852, and hold it to be inoperative as against the attachment and levy.

Upon what is shown in the case, the court, by unanimous opinion, think that the death of George W. Strong did not affect the right of the orator to enforce the judgment obtained against him before his death by execution and levy.

The decree of the chancellor granting relief according to the prayer of the bill is affirmed. Remanded with mandate accordingly.